UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Stephanie Schee, *as Personal Representative of
the Estate of Nathan Gebauer*,

        Plaintiff,

v.

Ottawa County, *et al.*,

        Defendants.

Case No. 3:21-cv-1680

MEMORANDUM OPINION
AND ORDER

## I.    Introduction

Plaintiff Stephanie Schee, as personal representative of the Estate of Nathan Gebauer, filed suit against Defendants Ottawa County, Ohio, Ottawa County Sheriff Stephen J. Levorchick, Sergeant Shannon Blankenship, and Deputy Thomas Szabo, alleging the Defendants violated Gebauer's rights under federal and state law through their actions leading up to Gebauer's death at the Ottawa County Jail. (Doc. No. 1). The Defendants have moved for summary judgment on all claims asserted in the Complaint. (Doc. Nos. 39 and 41). Those motions are fully briefed. (Doc. Nos. 46, 47, 50, and 51). After briefing was completed, Blankenship filed a motion for leave to file a notice of supplemental authority. (Doc. No. 52). For the reasons stated below, I grant all three motions.

## II.    Background

On September 12, 2019, Gebauer appeared in the Ottawa County, Ohio Court of Common Pleas for an initial appearance and arraignment related to a felony charge of possession of cocaine

and a misdemeanor charge of possession of drug paraphernalia. (Doc. No. 46-2 at 2-3, 6). After Gebauer admitted to the magistrate presiding over the court hearing that he currently had illegal drugs in his system, he was ordered to submit to a drug test and then to report to the Ottawa County Sheriff's Department, where he would be held in custody until he tested "negative for all substances except marijuana." (*Id.* at 4-5). At 10:01 a.m. that morning, Gebauer was booked into the Ottawa County Detention Center (the "Jail"). (Doc. No. 39-2 at 7).

Gebauer first spoke with Deputy Corrections Officer Robert Dockstader to complete a housing classification form. (*Id.* at 14-16). Gebauer reported to Dockstader that he had recently used illegal drugs, that he suffered from diabetes and previously had part of his feet amputated as a result, and that he took mental health medication. (*Id.* at 14). Gebauer expressed an interest in counseling through the jail but denied he had little interest or pleasure in doing things, or that he felt down, depressed, or hopeless, in the previous two weeks. (*Id.* at 14-15). Dockstader, based upon his interactions with Gebauer, did not think Gebauer was suicidal. (*Id.* at 14).

Deputy Sergeant Mary Morse completed the rest of the Jail's screening procedures. Gebauer told Morse he likely would go through withdrawal because he had taken fentanyl the day before and provided her with a list of his current prescription medications. (*Id.* at 9). He also informed Morse that he was on a special diabetic diet, which called for him to eat 100 grams of carbohydrates with every meal and to have a snack at night. (*Id.*). Morse noted that Gebauer used a cane and wore special stockings and shoes because of his diabetes and his partial amputations. (*Id.*). Morse allowed Gebauer to keep his own shoes and stockings rather than wear the usual Jail-issued footwear "based on [her] understanding that Mr. Gebauer's diabetic condition was serious and affected his foot health." (Doc. No. 41-5 at 3).

Gebauer indicated that he currently suffered from depression but denied he had ever had a nervous breakdown, attempted to kill himself, been told he needed psychiatric help, or been afraid

he was losing his mind. (Doc. No. 39-2 at 10). Gebauer also stated he was not thinking about killing himself and that he had not had a family member or significant other attempt or commit suicide. (*Id.* at 11). Morse, based on her interactions with Gebauer, stated she did not believe he showed serious psychiatric problems or that he was a suicide risk. (*Id.*).

Gebauer also spoke with Dr. James McLean, the Jail's physician. According to Dr. McLean, Gebauer was scheduled to begin a rehab program in a few days and Gebauer was upset he would go through withdrawal at the Jail rather than at the rehab program. (Doc. No. 37 at 5). Dr. McLean told Gebauer about the Jail's withdrawal program, but Gebauer initially declined. (*Id.* at 6). Gebauer also declined Dr. McLean's offer to prescribe "other medications that might help his mood." (*Id.*). In both circumstances, Dr. McLean understood Gebauer's decision to be motivated by the fact "he had every anticipation he going to be leaving [the Jail] shortly thereafter." (*Id.*). Dr. McLean's records indicate Gebauer eventually agreed to be placed on the opioid withdrawal protocol. (*Id.* at 10).

Gebauer also told Dr. McLean he had diabetic neuropathy in both feet and suffered from ulcers as a result. (*Id.* at 5). Dr. McLean recalled that Gebauer's condition was pretty advanced and there was little Jail officials could do to treat his diabetes other than provide Gebauer with insulin and try to ensure his feet were not further damaged. (*Id.* at 6).

After completing the booking process, Gebauer was placed in Cell G-1, which is located near the Jail's control room and medical office and is considered to be a medical observation cell. (Doc. No. 41-4 at 2). Due to his health conditions, including his diabetes, Gebauer was placed on a 30-minute personal observation watch. (*Id.*); (*see also* Doc. No. 39-2 at 20-23). A nurse informed the corrections officer that Gebauer was refusing to take his medications and that they "could just 'stop asking him already.'" (Doc. No. 39-2 at 20).

3

Around this time, Szabo began interacting with Gebauer during the 30-minute checks. (Doc. No. 41-4 at 2). Gebauer refused Szabo's request that he take his diabetes medication and later declined to take the evening meal, though Gebauer then changed his mind and requested food a short time later. (*Id.*); (Doc. No. 39-2 at 20). Gebauer ultimately ate "the equivalent of three meals." (Doc. No. 41-4 at 2).

Schee, Gebauer's mother, visited Gebauer at the Jail during the evening visiting hours on the day Gebauer was booked into the Jail. (Doc. No. 33 at 14). Schee recalls Gebauer expressed appreciation that he was able to keep his diabetic shoes and stockings and also reported the Jail would provide him with extra food if he needed it. (*Id.* at 15). She did not observe anything during this visit that led her to believe Gebauer was contemplating suicide. (*Id.* at 16).

Around 10:50 p.m., Gebauer was issued his medication. (Doc. No. 39-2 at 20). A short while later, a deputy informed Blankenship that Gebauer's blood sugar was very high, but he was refusing to take his insulin. (Doc. No. 34 at 70-72). Blankenship called Dr. McLean about the reading, and Dr. McLean instructed Blankenship to give Gebauer 25 units of insulin. (Doc. No. 39-2 at 3). Gebauer again refused and requested something to eat with the insulin. (*Id.*). Blankenship cleared Gebauer's request with Dr. McLean and Gebauer was offered the Jail's usual snack for diabetics, two full graham crackers and a serving of peanut butter. (*Id.*). Gebauer refused both the snack and the insulin, stating the snack was not enough for the amount of insulin he would take. (*Id.*). Blankenship again called Dr. McLean, who advised him to monitor Gebauer for the remainder of the night. (*Id.*).

Blankenship then went to Gebauer's cell to attempt to persuade him to take the insulin. Blankenship reminded Gebauer that high blood sugar could be harmful to him and asked why he would not take his insulin. (Doc. No. 34 at 81). When Gebauer responded with words to the effect that he "[did not] want to," Blankenship disclosed that he also was a diabetic in an attempt to

4

"connect . . . and reason with" Gebauer." (Doc. No. 39-2 at 4). Blankenship told Gebauer he was a Type I diabetic, but Gebauer dismissed the statement, telling Blankenship they were "completely different" because Gebauer was a Type II diabetic. (*Id.*). Gebauer then told Blankenship that "he would rather die than take his insulin." (Doc. No. 34-6 at 1). When Blankenship responded, "so you would rather die than take your insulin," Gebauer responded "yes." (Doc. No. 39-2 at 4). Blankenship recalled that, as he walked out of Gebauer's cell, he told Gebauer out of frustration that he was "a special kind of person." (*Id.*). Blankenship did not relay Gebauer's statement to anyone else at the jail at that time.[1] (Doc. No. 34 at 83-84; Doc. No. 34-6 at 1-2).

A few hours later, around 2:50 a.m. on September 13, 2019, Blankenship returned to Gebauer's cell and again requested to check Gebauer's blood sugar level. (Doc. No. 39-2 at 4). Gebauer declined, saying he felt fine. (*Id.*). At 3:30 a.m., Gebauer reported to another deputy that he had fallen off his bunk but that did not need medical attention. (Doc. No. 34 at 89-90). An hour later, at 4:30 a.m., Blankenship ordered that Gebauer be moved to cell J-2, which was across from the jail's central control, so that Gebauer could be even more closely monitored. (Doc. No. 39-2 at 5). Blankenship was concerned Gebauer might fall again and wanted deputies to have a better view. (*Id.*). The 30-minute checks continued through the remainder of the shift with no further incidents. (*Id.* at 21).

When the first shift officers arrived, Blankenship briefed the oncoming sergeant, Sergeant Rachel Greer, on Gebauer's status. Blankenship told Greer that Gebauer had refused to take insulin

---

[1] After Gebauer's death, Blankenship wrote a report documenting his conversation with Gebauer. (Doc. No. 46-8 at 2). Further, during the investigation into Gebauer's death, Blankenship stated he told another deputy about the conversation on the morning of September 13. After it was confirmed that the other deputy was not in fact working at the jail on September 13 and denied that Blankenship told her about Gebauer's statement he would rather die than take his insulin, Blankenship was terminated for neglect of duty and dishonesty. (Doc. No. 46-7 at 2-3). Blankenship's employment was reinstated after an arbitrator overturned his discharge. (Doc. No. 34-9).

or to have his blood sugar checked, that Blankenship had spoken with Dr. McLean about Gebauer, and that Blankenship had moved Gebauer to cell J-2 so he could be more closely monitored. (Doc. No. 34 at 99).

Shortly thereafter, Gebauer again refused to have his blood sugar checked or to take his insulin, telling one deputy he would "just wait [until] he has to go to the hospital for the condition he is putting himself in." (Doc. No 39-2 at 21). But approximately 15 minutes later, Gebauer changed his mind and agreed to test his blood sugar level. When the test revealed Gebauer's blood sugar level was too high to register on the Jail's testing device, Greer contacted Dr. McLean. (Doc. No. 35 at 6; Doc. No. 39-2 at 21-22). Dr. McLean instructed Greer to provide Gebauer with 40 units of insulin. (Doc. No. 35 at 6). Jail inmates normally injected themselves with insulin using an injection pen with a dial setting the correct dosage. (*Id.*). Greer handed Gebauer the injection pen and Gebauer injected himself with 40 units of insulin. (*Id.*). Gebauer then attempted to reset the injection pen and inject himself with additional insulin. (*Id.*). Greer and another deputy intervened and Gebauer handed the injection pen while laughing at the officers. (*Id.*). Greer was unsure whether Gebauer had successfully injected himself a second time, so she again contacted Dr. McLean, who advised her to keep an eye on Gebauer and to check his blood sugar again in a few hours. (*Id.* at 7).

Around this time, Gebauer began telling corrections staff members that he needed to go to the hospital. (*Id.*). Deputies continued monitoring Gebauer pursuant to Dr. McLean's order before re-checking Gebauer's blood sugar shortly after 9:00 a.m. (Doc. No. 39-2 at 22). When the test again showed his level was too high to register, Greer again contacted Dr. McLean, who directed her to give Gebauer another 20 units of insulin. (Doc. No. 34 at 8-9). Gebauer refused to take the insulin and continued to ask to go to the hospital. At. 9:49 a.m., Dr. McLean advised deputies to

6

have Gebauer taken to the emergency room. (Doc. No. 39-2 at 22). A deputy took Gebauer to the emergency room at 10:00 a.m.

Gebauer returned to the Jail shortly before 1:00 p.m. and was placed back into cell J-2, outside of the Jail control center. (Doc. No. 41-4 at 3). The 30-minute cell checks then resumed. (Doc. No. 39-2 at 23). Szabo arrived for his 2:00 p.m. shift and participated in the periodic checks on Gebauer. (Doc. No. 41-4 at 3-4). At 3:00 p.m., Szabo observed Gebauer seated on the toilet behind a privacy screen before continuing his rounds. (*Id.*).

Jail surveillance video subsequently revealed that, prior to Szabo passing his cell, Gebauer was removing the shoestrings from his diabetic shoes while seated behind the privacy screen. (*See* Doc. No. 42). After Szabo passed Gebauer's cell, Gebauer stood up and tied one end of his shoestrings to a bar in his cell, wrapped the other end around his neck in the form of a noose, and allowed his legs to go slack. (*Id.* at 3:00:06 to 3:02:58). When Szabo arrived at Gebauer's cell for the next 30-minute check at approximately 3:28 p.m., he discovered Gebauer hanging behind the privacy screen. (*Id.* at 3:27:57); (Doc. No. 41-4 at 4). Szabo called for help and then entered Gebauer's cell and lifted his body to attempt to reduce the pressure from the shoestrings. (Doc. No. 42 at 3:28:00 to 3:28:27). A sergeant arrived and cut the shoestrings, and Szabo laid Gebauer down on the floor. (Doc. No. 40 at 38-39). Szabo and the sergeant attempted to resuscitate Gebauer, but tragically, they were not successful. (*Id.* at 39). Gebauer subsequently was pronounced dead.

### III.  STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the [record] . . . ,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The

7

movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.

Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. Gen. Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). But "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter.'" *Wiley v. United States*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249). Therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, I must determine "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## IV. ANALYSIS

### A. OTTAWA COUNTY

Ottawa County first argues all claims against it must be dismissed because Plaintiff sued Ottawa County rather than its county board of commissioners, and Ottawa County does not have the capacity to be sued under Ohio law. (Doc. No. 41-1 at 23).

Under Ohio law, unchartered counties (a category which irrefutably includes Ottawa County) are not capable of being sued. *Estate of Fleenor v. Ottawa Cnty.*, 208 N.E.3d 783, 787 (Ohio 2022) (holding "Ottawa County is not sui juris."). Unchartered counties must be sued through the county board of commissioners. *Id.* at 786. Plaintiff did not do so and, therefore, I dismiss Ottawa County from this litigation.

Plaintiff offers several arguments in response, none of which are persuasive. She first asserts that naming a county as a defendant rather than the board of commissioners is a "formulistic distinction . . . without merit." (Doc. No. 47 at 22 n.3). Whether or not the distinction is formulistic, the Supreme Court of Ohio has unequivocally stated this distinction is dispositive. *See Fleenor*, 208 N.E.3d at 786-87.

Next, Plaintiff contends the Ottawa County Board of Commissioners has been on notice of this litigation and she should be granted leave to amend her complaint to name the correct party. (Doc. No. 47 at 22 n.1). This argument lacks merit for several reasons. First, It is well settled that a plaintiff may not amend the complaint with a brief request included in the plaintiff's opposition to a defendant's Rule 56 motion, because Rule 15 governs motions to amend the complaint. *See, e.g., Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 789 (6th Cir. 2005) ("A non-

9

moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.") (quoting 10A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005)); *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) ("[A] plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion."); *Powell-Lee v. HCR Manor Care*, 231 F. App'x 438, 440 (6th Cir. 2007) (affirming district court's denial of plaintiff's attempt "to amend her complaint via argument in opposition to the motion for summary judgment"). While Plaintiff stated her intention to file a motion to amend her complaint to name the proper defendant, (Doc. No. 47 at 22 n.3), she did not do so.

Second, Plaintiff was on notice of the *sui juris* issue for several years before Ottawa County moved for summary judgment. (*See* Doc. No. 13 at 12) ("Defendant Ottawa County is not *sui juris*[] and is not an entity capable of being sued."). Plaintiff offers no explanation for her prolonged delay in attempting to remedy this defect.

Finally, Plaintiff, citing *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012), argues "Ottawa County's participation in this lengthy litigation constitutes a waiver of this defense, even if it was raised in its answer." (Doc. No. 47 at 22 n.3). But that case does not help Plaintiff. *King* involved the question of whether the defendant waived the affirmative defense of insufficient service of process. 694 F.3d at 658. There, the Sixth Circuit held defendants are required to raise service and other Rule 12(b) defenses by motion and that waiting too long to do so may result in forfeiture of the defense. *Id.*

Ottawa County's defense is fundamentally different than a service defense or even a jurisdictional defense. Ohio law states that unchartered counties like Ottawa County are not capable of suing or being sued, *Fleenor*, 208 N.E.3d at 786, and Plaintiff fails to point to any case in which a court held that an unchartered county could waive its lack of legal status.

I conclude Ottawa County is entitled to the dismissal of all claims against it as a matter of law.

### B. BLANKENSHIP AND SZABO

There is a procedural matter to address before I consider the parties' arguments concerning Plaintiff's claims against Blankenship and Szabo. As I noted above, Blankenship filed an unopposed motion for leave to file supplemental authority, drawing my attention to the post-briefing decision of the United States Court of Appeals for the Sixth Circuit in *Lawler ex rel. Lawler v. Hardeman Cnty.*, 93 F.4th 919 (6th Cir. 2024). (Doc. No. 52). "Whether to permit parties to file notices of supplemental authority is a matter left to [a court's] discretion." *Dino Drop, Inc. v. Cincinnati Ins. Co.*, 544 F. Supp. 3d 789, 804 (E.D. Mich. 2021). The Sixth Circuit's published decision in *Lawler* speaks directly to the issues at the heart of the parties' summary judgment briefing.[2] Therefore, I grant Blankenship's motion.

#### 1. Qualified Immunity

Plaintiff alleges Blankenship and Szabo were deliberately indifferent to Gebauer's serious medical needs, in violation of his Fourteenth Amendment rights. Both defendants contend they are entitled to summary judgment on this claim pursuant to the doctrine of qualified immunity. (Doc. No. 39 at 13-23; Doc. No. 41 at 24-32).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

---

[2] In *Lawler*, the Sixth Circuit reiterated that the qualified immunity analysis requires courts to determine whether caselaw clearly established that a public official's actions were unconstitutional at the time the official acted. 93 F.4th at 921. While the current standard "hold[s] officers liable if they *recklessly overlooked* a pretrial detainee's strong likelihood of suicide," the clearly established law at the time of the decedent's passing in *Lawler* – and at the time of Gebauer's death – "required proof that the officers *subjectively believed* that there was a strong likelihood the inmate would commit suicide." *Id.*

11

(quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). There are two parts to the qualified immunity inquiry: (1) do the facts show a violation of a constitutional right, and (2) was that constitutional right "'clearly established' at the time of [the] defendant's alleged misconduct?" *Pearson*, 555 U.S. at 232. Courts have the discretion to consider either one of these two analytical parts first "in light of the circumstances in the particular case at hand." *Id.* at 236.

The Constitution protects a pretrial detainee's right to adequate medical treatment. Jail officials violate that right if they act with deliberate indifference to the detainee's serious medical needs. *See, e.g., Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (2020). The "deliberate indifference" standard has an objective and a subjective component. *See, e.g., Downard for Est. of Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020).

The objective component requires the plaintiff to show a pretrial detainee had "a 'sufficiently serious' medical need." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A detainee's "[p]sychological needs may constitute such 'serious medical needs[,]' particularly when those psychological needs 'result in suicidal tendencies.'" *Id.* (quoting *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)). "'[A]mple case law teaches that deliberate indifference toward a detainee's suicidal tendencies is a violation of Constitutional rights.'" *Moderwell v. Cuyahoga Cnty., Ohio*, 997 F.3d 653, 665 (6th Cir. 2021) (quoting *Linden v. Washtenaw Cnty., Mich.*, 167 F. App'x 410, 425 (6th Cir. 2006)).

But the Sixth Circuit has "held that 'the generalized right of a prisoner to be free from deliberate indifference [to a known serious medical need] cannot support a finding that there was a clearly established right to be protected from committing suicide.'" *Perez v. Oakland Cnty., Mich.*, 466 F.3d 416, 429 (6th Cir. 2006) (quoting *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1096-97 (6th Cir. 1992)) (alteration by *Perez*). *See also Troutman*, 979 F.3d at 482 (noting inmates "do not have a guaranteed Eighth Amendment right to be screened correctly for suicidal tendencies") (citation and

internal quotation marks omitted). In cases like this one, "a plaintiff meets the objective component of the Eighth Amendment analysis by demonstrating that the inmate exhibited suicidal tendencies during his or her detention or that he posed a strong likelihood of another suicide attempt." *Grabow v. Cnty. of Macomb*, 580 F. App'x 300, 307 (6th Cir. 2014) (citation and internal quotation marks omitted).

In order to satisfy the subjective component, "'it is not enough to establish that an official may have acted with deliberate indifference to some *possibility* of suicide, or even a *likelihood* of suicide; the test is a *strong likelihood* of suicide.'" *Downard*, 968 F.3d at 601 (quoting *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013)) (emphasis in *Galloway*). "This is a high bar and typically requires evidence that the inmate was already on suicide watch, previously attempted suicide under similar conditions, or recently expressed a desire to self-harm." *Downard*, 968 F.3d at 601.

Plaintiff first argues I should decline to apply the doctrine of qualified immunity because some legal scholars and organizations have questioned its validity. (Doc. No. 46 at 21; Doc. No. 47 at 30). But published decisions of the Supreme Court and the Sixth Circuit are binding on lower courts until those decisions are appropriately modified or overturned. *See, e.g., United States v. Clinton*, 338 F.3d 483, 489 (6th Cir. 2003). And both courts continue to apply qualified immunity to plaintiffs' constitutional claims. *See, e.g., Rivas-Villegas v Cortesluna*, 595 U.S. 1 (2021); *Hall v. Navarre*, 118 F.4th 749 (6th Cir. 2024). Therefore, I conclude I must consider Blankenship and Szabo's qualified immunity defenses.

As an initial matter, it is unclear whether Plaintiff has identified a clearly established constitutional right. Plaintiff argues "the Sixth Circuit has expressly held that the right to the provision of suicide prevention services, which form the basis of Plaintiff's claims, is clearly established." (Doc. No. 46 at 21) (citing *Bays v. Montmorency Cnty.*, 874 F.3d 264, 270 (6th Cir. 2017)).

13

But *Bays* does not say this. Instead, the court in that case acknowledged "inmates have *no* clearly established right to proper implementation of suicide prevention procedures." *Bays*, 874 F.3d at 270 (citing *Taylor v. Burkes*, 575 U.S. 822, 826 (2015) (per curiam) (emphasis added)). The clearly established right involved in that case was the "right to have a serious psychological illness treated seriously." *Bays*, 874 F.3d at 270. But even if I assume Plaintiff has identified a clearly established right, Szabo and Blankenship still are entitled to qualified immunity because Plaintiff has not pointed to evidence creating a genuine dispute of material fact about the subjective component of her deliberate indifference claim.

Plaintiff argues Szabo is not entitled to qualified immunity because he knew Gebauer "was in custody for failing a drug test and was acting irritable and cussing at staff while refusing to take his meals." (Doc. No. 47 at 31). But Plaintiff fails to point to any evidence to show Szabo believed Gebauer was "strongly likely to kill himself." *Lawler*, 93 F.4th at 932. Szabo knew Gebauer was diabetic, had refused to take his insulin previously, and had been taken to the hospital following an incident with his insulin before being cleared to return to the jail. (Doc. No. 41-4 at 2-3).

Further, Szabo expressly denied being told that Gebauer had exhibited potential warning signs of suicide during his intake screening. (Doc. No. 40 at 33). In short, Plaintiff has not identified any evidence that Szabo had any prior knowledge that Gebauer might attempt to take his own life, much less "a strong likelihood" that he would do so. *Downard*, 968 F.3d at 601 (emphasis removed). Therefore, I conclude Szabo is entitled to qualified immunity on Plaintiff's deliberate indifference claim.

I similarly conclude Blankenship is entitled to qualified immunity. At the time of Gebauer's death, the clearly established law required that a plaintiff prove the "officer knew of the facts creating the substantial risk of serious harm" and "that the officer believed this substantial risk existed." *Lawler*, 93 F.4th at 929. *See also Farmer*, 511 U.S. at 837 (A prison official may not be held

14

liable for deliberate indifference to an inmate's serious medical needs "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Moreover, even if the officer knows of the substantial risk of serious harm, the plaintiff must show "the officer 'responded' to the risk in an unreasonable way." *Lawler*, 93 F.4th at 929 (quoting *Farmer*, 511 at 844)).

Plaintiff argues that Gebauer's comment that he would rather die than take his insulin, combined with Blankenship's failure to tell anyone about the comment or to take Gebauer's shoelaces, creates a genuine dispute of material fact. Plaintiff's argument is not persuasive. The Sixth Circuit has held a jury could not conclude an officer believed an inmate had a strong likelihood of committing suicide when the "inmate's potentially suicidal conduct could be explained on other grounds." *Lawler*, 93 F.4th at 935.

Blankenship has offered such an explanation. He knew Gebauer was a diabetic who was refusing meals and insulin while incarcerated for failing a drug test while on bond.[3] (Doc. No. 39-2 at 3-4). Blankenship entered Gebauer's cell to attempt to persuade him to take his insulin by disclosing that he also was diabetic, but Gebauer rejected this entreaty because the two did not have the same type of diabetes. (*Id.* at 4). It was in the context of this conversation that Gebauer stated he would rather die than take his insulin. (*Id.*). Blankenship testified that, as a result, he did not interpret Gebauer's statement as a suicide warning sign, but as a refusal to take his prescribed medication. (Doc. No. 34 at 84; Doc. No. 39-2 at 4).

---

[3] The Sixth Circuit previously affirmed a district court's decision granting summary judgment to jail medical staff after an inmate who was withdrawing from illegal drugs and refusing meals and medication committed suicide. *Broughton v. Premier Health Care Serv., Inc.*, 656 F. App'x 54, 57-58 (6th Cir. 2016).

15

Plaintiff contends I should not grant Blankenship summary judgment because a jury "could easily disbelieve" Blankenship's statements that he did not perceive Gebauer's words to be a suicide threat because Blankenship did not tell the truth about his interaction with Gebauer in the days following Gebauer's death. (Doc. No. 46 at 27). Plaintiff argues that Blankenship's attempts to cover up his failure to document his conversation with Gebauer is evidence that Blankenship "clearly recalled the conversation and understood it to be a statement of the risk of suicide." (*Id.* at 26).

But "[a]s a general rule, the possibility that the jury might disbelieve a witness 'is not [normally] considered a sufficient basis for drawing a contrary conclusion.'" *Bell v. Consol. Rail Corp.*, 306 F. Supp. 2d 718, 721 (N.D. Ohio 2004) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984)) (second alteration by *Bell*). And, at most, Blankenship's actions and statements after Gebauer's death demonstrate an awareness that he should have interpreted Gebauer's words as demonstrating a risk of suicide. A jury could not reasonably infer from Blankenship's post-incident conduct that at the time of his conversation with Gebauer, he in fact believed there was a strong likelihood Gebauer would commit suicide.

Blankenship's "'failure to alleviate a significant risk that he should have perceived but did not,'" based upon the standards applicable to his conduct at the time of Gebauer's death, does not rise to the level of a constitutional violation. *Lawler*, 93 F.4th at 936 (quoting *Farmer*, 511 U.S. at 838). Therefore, I conclude he is entitled to qualified immunity as to Plaintiff's deliberate indifference claim.

### 2. Statutory Immunity

Plaintiff asserts two state-law claims against Blankenship and Szabo: a claim that those two Defendants violated their duty of care to Gebauer through willful, wanton, or reckless misconduct, and a wrongful death claim. For the same reasons I rejected Plaintiff's federal law deliberate-

indifference claim, I conclude Szabo and Blankenship are immune from Plaintiff's state law claims brought under Ohio Revised Code § 2744.03(A)(6) and § 2744.02(B). *See Downard*, 968 F.3d at 602-03 (holding qualified immunity analysis applies to state law immunity defenses based upon the same material facts), and *Chesher v. Neyer*, 392 F. Supp. 2d 939, 958 (S.D. Ohio 2005) (citing *Wilson v. Stark Cnty. Dep't of Hum. Servs.*, 639 N.E.2d 105, 107 (Ohio 1994)). Therefore, I grant their motions for summary judgment on these claims as well.

### B. SECTION 1983 POLICY AND PRACTICE

Lastly, Plaintiff asserts a claim against Levorchick in his official capacity as the Ottawa County Sheriff, pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), for maintaining a pattern and practice of failing to prevent inmate suicides. (Doc. No. 1 at 9-10). "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986)). *See also City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."). Levorchick is entitled to summary judgment on this claim, as I have concluded the individual defendants are entitled to qualified immunity.

### V. CONCLUSION

For the reasons stated above, I grant Blankenship's motion for leave to file a notice of supplemental authority, (Doc. No. 52), and the Defendants' motions for summary judgment on all claims asserted in the Complaint. (Doc. Nos. 39 and 41).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge